This is a suit brought by the plaintiff, James Oliver York, for compensation for total and permanent disability as a result of an accident he suffered while in the employ of the defendant, and in which he alleged that he sustained a ruptured intervertebral disc. Plaintiff alleged that he was employed by defendant to work in its manufacturing plant and that on or about the 10th day of January, 1945, while so employed as a T. E. L. operator, he suffered a severe injury to his back; that he was accidentally injured while engaged in moving heavy alloy hoppers, which was a part of the duties of his employment, and that while pulling and straining and moving said hoppers, he suffered the damage to the lower region of his back which resulted in the rupture of an intervertebral disc which necessitated a major fusion operation.
Plaintiff further alleged that at the time of the accident he considered that he had suffered only a strained back and that, for this reason, he did not immediately complain to his employer but continued working in an attempt to perform the duties required of him, thereby suffering increasing pain and disability; that within a few days thereafter his back became so painful that he was required to take a sick leave for several weeks, and that, at this time, he reported to the First Aid Station maintained by his said employer upon the premises, and told the employees there of this back condition; that he remained away from the job for a period of about twelve weeks and was placed in traction and given other treatment by Dr. Anderson and other physicians in New Orleans and Baton Rouge; that within a few weeks following the accident, plaintiff alleges that he reported the condition to Dr. Beam, the regularly retained physician of defendant, but that he did not make any claim for compensation at that time as he did not understand the nature and extent of his injury and did not know what the prognosis of his condition would be, and, in the meantime, he was receiving his full salary.
Defendant entered a general denial and particularly denied that plaintiff suffered any such injury or accident in its employ.
The case was duly tried and, without written reasons, the trial judge dismissed plaintiff's suit at his cost. Plaintiff has appealed from the judgment of the Lower Court.
Attorney for the plaintiff, in his brief, states: "The Trial Court dismissed the suit on the ground that the plaintiff had failed to show as a cause for his condition an accident arising out of and within the scope of his employment."
Counsel for defendant, in their brief, state that: "In dismissing the suit, the trial judge, in his oral reasons for judgment, stated that plaintiff-appellant had not only failed to prove an accident but also that he had, by his own testimony, entirely disproved the occurrence of a compensatory *Page 70 
accident and that the witnesses to whom he allegedly complained failed to corroborate any of his versions."
Both counsel for plaintiff and defendant, therefore, agree that the Trial Judge dismissed the plaintiff's suit for the reason that he had failed to prove an accident arising out of and within the scope of his employment. This is the main question in the case.
Counsel for plaintiff in his brief, page 2, made the following admission: "* * * Admittedly the plaintiff did not show a single accident that could have caused the ruptured disc * * *."
Again on page 9 of plaintiff's brief, he states: "Plaintiff did manifest confusion as to dates, and it is otherwise evident that there is nothing in the record that would justify this court in saying that any single accident produced his condition."
It is, therefore, unnecessary to discuss the testimony as to the alleged accident on or about January 10, 1945. Plaintiff contends that, taking all the testimony in the case, it conclusively shows that plaintiff's injury was caused by a series of strains or repeated injuries which were caused by the nature of the duties he was required to perform for the defendant and that, therefore, plaintiff's condition was due to an accident arising out of and within the scope of his employment, within the intent and meaning of the compensation laws.
The facts disclosed by the record in this case showed that the plaintiff was employed by the defendant on January 11, 1940; that he remained in their employ until September, 1945, doing rather heavy manual work, but experienced no difficulty in performing his duties until approximately the middle of 1944. Plaintiff was employed on the fourth floor in the lead building as a laborer by the defendant. After approximately one year six months, plaintiff then went to work on the third floor, which is known as the "still floor", where, he testified, that when things were running good it was easy but that when things did go wrong it would necessarily make the work harder. In the process of this work, each still had a manhole on top of it with a lid on it that was held down by eight bolts and nuts. It was necessary to unscrew these nuts on the bolts and pull the lid up in order to look into the still to see that it was clean and ready to re-charge, and, further, at times the alloy would come into the still so fast that the agitator in the still would not work and it would then be necessary to chip this alloy out by hand with a chisel about twelve feet long. During this period of plaintiff's employment, he stated that a line (which he called the "sludge line") would get blocked up and that this would require quite a bit of heavy work as it would be necessary to take a sledge hammer and beat on the line and, if this didn't unstop the line, sometimes he would have to take a section of the line apart and chip it out, all of which, plaintiff testified, required heavy manual labor.
Plaintiff continued to work on the third floor performing manual labor for about two years and then went to the fifth floor in the same building. This work was not so hard but plaintiff was required to pull what is referred to as a hopper, which plaintiff described as being a device that sits on four legs, about three and one half feet in diameter and about three feet in depth. Each hopper weighed 4,250 pounds gross. They are pulled by means of a hydraulic jack or hopper truck. This hopper truck is on four wheels, each wheel being about ten inches in diameter with hard rubber tires, and the truck is run under the hopper and when you push the hopper truck handle down, it raises the hopper off the floor; in other words, it works like a hydraulic jack for an automobile. Plaintiff testified that starting and stopping these hoppers required considerable strength and at times, the employee would have to strain.
After six or eight months on the fifth floor, plaintiff was put to work in the chloride bulk storage. At the chloride bulk storage there were sixteen chloride tanks and when plaintiff came to work he would check all sixteen tanks, and, in doing this, he had to climb a ladder on each tank. At the end of his work period he had to repeat the same climbing process. On this particular job, he was also required to carry acetone which, he stated, would be carried about three hundred yards in two *Page 71 
five-gallon cans. The company asked that they carry one five-gallon can but the men usually carried two at a time, and would make such a trip every three or four hours. These five-gallon cans of acetone would weigh about 40 pounds each. Plaintiff did not have any difficulty performing the labor in the chloride bulk storage plant. After eight months of work in the bulk storage plant, he went to work in the wash room some time after September, 1944.
Among plaintiff's duties about November, 1944, was pulling hoppers and also it was about this time that he had a sore feeling in his back, and he testified that he went to Dr. Lawrence J. Kern, his personal physician. It was at this time that the plaintiff stayed off from work about twelve days. After twelve days, plaintiff returned and continued to perform the same duties until, he testified, about January 10th: "I wouldn't know exactly the date. I was pulling a hopper and I put the hydraulic jack under one and when I strained there was a hot flash went down my right leg. Seemed like my hip jumped out of place, and I was unable to walk for a few minutes. I believe it was about 5:30 in the afternoon." Plaintiff testifies that this happened about January 10th or January 7th, and he remembered that it was later than the fifth of January because he remembered "feeling good on January 5th. I had an occasion to feel good on that day." The occasion, plaintiff testified, was a "little party."
Plaintiff further testified that after he had this sensation in his back that he went to the hospital and told the First Aid man, but that he did not remember who the First Aid man was, and that he got under the infra-red lamp for about thirty minutes. The day after the alleged accident, which plaintiff described as happening on or about January 10, 1945, plaintiff testified that he went in and talked with Dr. Beam, the company doctor, and that the doctor told him not to pull any more hoppers for a day or two, that it was probably a muscular pain. At that time he obtained a light duty slip but in two or three days he was asked if he felt like getting a slip for regular duty, which he did. Plaintiff states that after working one or two shifts he realized he could not do the work but that a fellow worker did his work for him for approximately ten days, after which he notified the defendant that he was not able to work and that he needed medical attention, so he was off from work for about eight weeks. Plaintiff testified that he left to obtain medical treatment about two weeks after the accident occurred. He was treated by Dr. Brostrom in New Orleans, who did not testify in the case, for which no reason is given.
After the eight weeks treatment, Dr. Brostrom sent him to a nerve specialist, Dr. Anderson, in New Orleans. Dr. Anderson recommended that he be put in traction but, as he could not get in the hospital in New Orleans, he was sent to Baton Rouge, and, while Dr. Anderson prescribed the treatment, Dr. Kern carried out his instructions at the Lady of the Lake Hospital in Baton Rouge. He remained in the hospital twenty-two days in March. After getting out of the hospital, he "loafed around" for about two weeks and then went back to work.
When he went back to work, he was given a job in the office. The plant hospital report contains a notation "restricted work," and shows the entry as being April 26, 1945, which plaintiff says is about the time he went back to work in the office. Plaintiff testified that he was feeling "pretty bad," and that, although he was working in the statistical department, that he had never had any training to do that kind of work; that he continued to work in the office until about the first of September, 1945, and that he had been told several times by a Mr. Wheeler, plant superintendent, that unless he was able to return to his regular work he would have to look for another job; that upon being informed of this the third time, he again attempted to go back to his regular work. He then went back to the bulk storage where he says that his supervisor (no name given) told him that he would draw first class pay but that the job which he had would be classified as a light duty job. Plaintiff states that he tried to perform the duties required of him for about two weeks but then realized that he would have to do something in order to correct his "ailment." *Page 72 
As a result of an examination by Dr. McHugh in August, 1945, his trouble was diagnosed as a ruptured disc. Plaintiff then went to the Ochsner Clinic in New Orleans and this diagnosis was confirmed and he was advised that it would take surgery to correct it. He submitted to an operation on October 2, 1945, performed by Dr. Echols and Dr. Altenberg at Touro Infirmary in New Orleans. He remained in the hospital twenty-six days and returned to Baton Rouge and states that he was unable to do any work even though he tried selling insurance, but it required quite a bit of walking and standing so he gave that up. Plaintiff, at the date of the trial, was thirty-one years of age and had a high school education. He testified that he could not possibly, in his present condition, resume his employment at the duPont Company.
The plaintiff called Albert S. Wright, Jr., an employee of the defendant, for cross examination. Wright testified that he had worked for the defendant eight years in March of 1945, and that he had worked with Mr. York and had known him from the time he first was employed by the defendant. He testified that the work which York had done on the fourth floor and on the third floor at times was hard work and that it required a man in good physical condition to do it; that York performed his work in a satisfactory manner and he did not notice anything wrong with him at that time. He also worked with him at the time they were moving hoppers which was some time after an explosion that occurred at the plant in September, 1944, and it was at this time that plaintiff complained about his back hurting him all the time. The witness did not recall any particular time that York had a bad pain but knew that several times he complained of his back hurting him and plaintiff would sit down and rest while waiting for the elevator to come back down; that York worked with him in 1945 for several months and that York's back was hurting him pretty bad and the company moved him back to a lighter job.
Emmett McCraine, who was called for cross examination by counsel for the plaintiff, testified that he had worked at the defendant company since January, 1937, and that he had known the plaintiff since he was first employed by defendant in 1940; that he had worked with York on the fifth floor six or eight months after he became employed by the defendant; that during that time, York did his work without any trouble or complaint and that he classified York as a good worker.
Plaintiff also called as a witness Mr. L. A. Hesselhuf who testified that he began working for the duPont Company in March, 1937, and that he had known the plaintiff for four or five years and had worked with him, he thought, at the defendant's plant in 1943 and 1944; that the plaintiff at that time was working in the bulk storage and that York performed his duties without any trouble. This witness testified that he later worked with York again about the middle of 1945 at the bulk storage (he did not remember the date) and at this time York complained of his back and that he made several trips to the hospital; that he personally saw him one time with the heat on him at the company hospital.
Plaintiff called under cross examination Joseph A. Douglas who testified that at the date of the trial he was in the real estate business but that prior to that he had been employed by the duPont Company from September 4, 1942 until September 14, 1945, in the Operational Department, and for a period of two or three weeks or maybe a month he worked next to York in the wash house. Along about September of 1944 until June of 1945, this witness testified that he did not remember the exact date, but he did know, particularly one night, York had come over to the wash house and that he was complaining of the pain in his back; that he asked York why he didn't go to the infirmary and get treated and York replied that it was hurting too bad, that he thought he would wait and see the doctor in the morning; that York finally went to the hospital that night and they put "one of these sun lamps or heat lamps on his back." He further testified that on another occasion he went to the hospital and saw York receive a similar treatment. *Page 73 
Plaintiff next called under cross examination as a witness Iris J. Hidalgo, who testified that he was employed at the Ethyl Corporation, and previous to that by its predecessor, the duPont Company; that he was employed May, 1942 and was working for the same plant up until the time of the trial; that he had known Mr. York and worked with him about two years on the third floor of "A" building, from 1942 until the first part of 1944, approximately two years; that during that time, York did his work in a satisfactory manner even though the work on the third floor required heavy manual labor.
Plaintiff next called Jack Hastings under cross examination. This witness testified that he was employed by the Ethyl Corporation, successor of the duPont Company, on the fifth floor in January, 1940, and knew the plaintiff well and had worked with him on the third and fourth floors, off and on from 1940 to 1942; that the work on the fourth floor was hard work but that York did his full share of the job during the time the witness was working with him; that the work on the third floor also required hard physical labor, and that York did his job very well there and that he had never heard him complain at all.
Plaintiff next called as witness under cross examination Edward W. Sanchez, who testified that he was employed by the duPont Company in 1937 and worked there up until 1942 when he went into the service. When he was released from service in November 1945 he went back to work for the Ethyl Corporation. This witness testified that he knew the plaintiff and had worked with him at the duPont plant on the third floor from approximately 1940 to 1942; that at the time he was third floor leader and York worked under him as a still man; that plaintiff was a good worker and that during that time he did not exhibit any physical disability and did his share of the work.
Plaintiff next called Paul B. Porter under cross examination, who testified that he had worked for the duPont Company from October, 1939 until February, 1941, when he went into the army. He came out of the army in November, 1941 and went back to work for the defendant until 1942 and then went back into the army; that he knew the plaintiff and had worked with him from some time in January, 1940 to February, 1941, and then again from November, 1941 to November 1942; that he worked with him in the lead areas on the third and fourth floors; that during the time he worked with him, York was a good worker and he had never heard him make any complaints of disability on account of the hard work his job required.
None of the above witnesses testified that York had told them of any accident on or about January 10, 1945. Counsel for the defendant objected to calling all of these witnesses under cross examination except Albert Wright, Jr., on the ground that they were not officials or representatives of the duPont Company or Ethyl Corporation within the meaning of the Hostile Witness Act. Defendant's objection was evidently abandoned as it is not urged in their brief, and the testimony of these witnesses is also quoted therein.
The record further discloses that plaintiff went to see and was treated by the following doctors:
Dr. Thomas Black, Hot Springs, Arkansas, April, 1944, who diagnosed the plaintiff's trouble as lumbago;
Treated by Dr. Kern and Dr. Hargrove of Baton Rouge, Louisiana, November, 1944 for backache;
Treated by Dr. Brostrom of New Orleans for eight weeks, first on January 22, 1945, who diagnosed his trouble as sciatica right undetermined;
Dr. Anderson, New Orleans, Louisiana, nerve specialist, subsequent to or during the time Dr. Brostrom was treating him;
Dr. Echols and Dr. Altenberg during August, 1945, who diagnosed his ailment as a ruptured disc and operated on plaintiff on October 2, 1945 and their diagnosis was confirmed;
Dr. Kirgin, an associate of Dr. Echols of New Orleans, Louisiana;
Dr. Rankin, a regularly employed physician at the plant of the defendant;
Dr. Beam, regularly employed at the plant of defendant during the time plaintiff was employed; *Page 74 
Plaintiff also consulted Dr. Moore, an osteopath, during November, 1944;
A Dr. Ducote, prior to September, 1945; Dr. Ducote prescribed arch supports;
Dr. Spedale, Plaquemine, Louisiana, during June or July, 1945;
Plaintiff testified he also went to see "a few physical therapists;" Dr. Don Singletary, who treated him possibly sixty days after January 1945, and he also visited two other physical therapists in Baton Rouge, one located on North Boulevard and the other on Perkins Road but doesn't remember their names. This was also after January, 1945;
Dr. T. Jeff McHugh, August, 1945, who diagnosed his trouble as a ruptured disc and advised him to visit Oschner Clinic.
Also introduced is the hospital record of the defendant company showing history, diagnosis and treatment of the plaintiff, James Oliver York, from January 19, 1940, the date of his employment, until September 26, 1945. While this record shows that York was treated for headache, indigestion, colds, chapped lips, athletes foot and every other ordinary ailment that plagues mankind, it also shows that from 1940 to April 11, 1944 there is no entry showing any complaint by York as to his back or even any mention of any trouble with his back, but beginning May 11, 1944, the hospital record shows the following entries as to his back condition:
 "5-11 10:00 P.M. O.K. after absence since April 2. Lumbago
 8-21 7:00 P.M. Requested Infra Red to back
 8-25 2:15 P.M. Requested Infra Red to back.
 8-26 2:00 P.M. Requested Infra Red to back.
 8-28 11:30 P.M. Requested Infra Red to back.
 8-29 11:30 P.M. Requested Infra Red to back.
 9-5 9:45 A.M. Retreat back with Infra Red 30 minutes
 9-15 12:50 P.M. Retreat back with Infra Red 30 minutes
 9-19 11:30 A.M. Retreat back with Infra Red 30 minutes.
 10-26 3:00 A.M. Retreat back condition. Rx Infra Red
 30 minutes.
 10-27 3:00 A.M. Retreat back condition. Rx Infra Red
 30 minutes.
 10-28 2:00 P.M. Retreat back condition. Rx Infra Red
 30 minutes.
 10-29 12:30 A.M. Retreat back condition. Rx Infra Red
 30 minutes.
 11-11 9:00 A.M. Still has some vague pains in lower
 back. Has been absent since 10-30.
 At present under care of Dr. Kern.
 Will report 11-13 for duty. To start
 out in Wash House.
 11-13 3:00 P.M. Back condition — V.O. Dr. Rankin.
 Order for light duty as report of 11-11
 11-13 10:00 P.M. Infra Red to back 30 minutes
 11-16 4:00 A.M. Infra Red to back 30 minutes
 11-17 5:00 A.M. Infra Red therapy for 30 minutes
 11-19 3:30 A.M. Infra Red Therapy for 30 minutes
 11-26 10:10 A.M. Retreat back condition, improved,
 Infra Red 30 minutes.
1945
 1-6 10:00 A.M. Had acute attack of back pain in getting
 out of auto at 3:30 1-5-45. Hot bath
 eased pain. Has been under care of
 Dr. Dacote for past two weeks for arch
 treatments. Will consult own physician
 and advise of decision. Has already had
 2 belts made but does not wear either.
 Will see me 1-8-45
 1-11 Consulted Dr. Simon of New Orleans who
 Rx an elastic belt. Given restricted
 duty to
 *Page 75 
 avoid steps and heavy lifting
 for a weeks period. Will consult him 1-18
 1-16 3:45 P.M. Still has trouble with hip. To see
 Dr. Simon in New Orleans 1-17
 1-19 2:00 P.M. Requested plaster bandage removed from
 back (granted)
 1-23 10:00 P.M. Has Rx from Dr. Brostrom of New Orleans
 for spine X-ray. To see Dr. Mattingly
 for pictures. Will probably see
 Dr. Brostrom Friday. Unable to work
 at present. Insurance papers given.
 1-30 3:30 P.M. X-rays taken by Dr. Mattingly were
 negative. See by Dr. Brostrom and sent
 him to specialist (?) who gave him
 treatment and light. Dr. Brostrom
 believes it is some nerve involvement
 in spine and leg. Is feeling better
 part of the time but still has
 considerable trouble in right hip,
 especially when getting out of bed.
 2-7 9:30 A.M. Feeling somewhat better, is to take
 treatments twice weekly from Dr. Brostrom.
 Pain is now more in lower leg and foot
 goes to sleep occasionally.
 2-15 Does not feel any better. Is to return
 to Dr. Brostrom 2-16 and if he is not
 improved may be hospitalized.
 2-22 9:30 A.M. Saw Dr. Brostrom 48 hours ago and took
 a Rx, feels better today. Dr. stated
 that if he did not do well would put
 him in traction tomorrow. Is not having
 much pain today.
 2-28 9:30 A.M. Reported. States condition about same.
 States that Dr. Brostrom requested
 quantitative blood and urine analysis
 for lead. Specimens sent to Dr. Kehoe.
 3-7 Visited today. Was not at home. Has
 probably gone to Mayo Clinic. No
 instructions left.
 3-9 Still under care of Dr. Brostrom of
 New Orleans. Has taken a series of
 14 'electrical' treatments and Vitamin
 Therapy. Symptoms are about the same.
 No improvement can be noted by patient.
 To see Dr. Brostrom on 3-13. Will report
 to hospital after that visit.
 3-19 Telephoned this p.m. to say has gotten
 bed at Our Lady of the Lake and may be
 in hospital 10 to 14 days. Will visit
 in hospital.
 3-20 Visited in hospital today. Says his pain
 is almost gone since has weight or
 traction on leg. Will visit again
 next week.
 3-26 Visited today. Is still in hospital
 with traction on right leg. Says is
 not feeling any better and may have
 operation. Will call plant medical
 department when he leaves hospital
 about Friday.
 4-14 2:30 P.M. Reported to plant hospital to see
 M. D. Has been off with pain in hip.
 Hospitalized
 *Page 76 
 for 3 weeks. General condition markedly
 improved. Patient feels good. No
 complaints except weakness. To report
 to plant hospital 4-17
 4-17 1:12 P.M. Discussed case with Wheeler. To come
 on day shift. Leg feels O.K. except
 for being weak. O.K. to return to work
 after 11 weeks absence.
 4-26 1:50 P.M. Doing much better. Some pain and spasm
 when climbs stairs or is on feet too
 long. Patient does not have any pain
 if he sits and stands erect or bends
 over too far. To see Dr. Brostrom about
 May 15. To continue on restricted work.
 Is taking massages and Hot Sitz baths.
 5-3 1:05 A.M. Feels about the same, some pain in hip
 and leg yesterday. Apparently is
 holding his own.
 5-10 1:00 P.M. Is to see Dr. Spedale in Plaquemine
 for more X-rays on 5-16 — has
 had a B.M.R. and blood work. Is feeling
 about the same.
 5-24 9:50 A.M. Repadded belt. Tinc. Benzoin to skin.
 Soreness on hips.
 7-16 3:00 P.M. Heat therapy to hips 20 minutes —
 is wearing belt.
 7-21 2:45 P.M. Heat therapy to hips 20 minutes
 8-4 1:05 P.M. L. of A. from 8-6 to 8-8 to see Dr.
 at Oschner Clinic — will write
 if necessary to stay for treatment.
 8-13 2:30 P.M. Reported in. Has been to Oschner Clinic
 and Mayo. Letter expected from Oschner.
 To report Friday.
 8-20 8:00 A.M. O.K. after two weeks absence. Treatment
 of leg.
 9-26 3:30 P.M. Dorothy Dupuy came came in to say
 York's wife says York is to be operated
 on in New Orleans Friday —
 (9-28-45)."

Dr. T. Jeff McHugh of Baton Rouge testified in part as follows:
"Q. Doctor, McHugh, did you have occasion to examine one James Oliver York? A. Yes.
"Q. Will you please state when that examination took place? A. I examined Mr. James Oliver York in my office on April 12th, 1946 and his history was that in November, 1944, after pulling hoppers he had a low back pain with radiation of soreness down the back of right thigh. Because of the pain he laid off eleven days in November, 1944 and then resumed work. He continued to have low back pain with sciatic radiation and it grew worse. He was compelled to quit work in January, 1945. He was seen August 14th, 1945 and a diagnosis of ruptured disc was made. A novacain block was done with no improvement and he was advised to consult a neuro-surgeon. Accordingly he was seen by Doctor Dean Echols, who examined him and had Doctor Altonberg, orthopedist, see him. On October 2d 1945, he was operated on at Touro Infirmary. Doctor Echols removed the disc between the fourth and fifth lumbar vertebrae and Doctor Altonberg did a lumbar fusion. Present complaints: He states that he yet has the same complaints that existed prior to the operation. He has some degree of relief by wearing a Knight type of brace which was put on about twenty-four hours ago. Examination: Well nourished and developed white male; giving his age as 31 years. The lumbar back is flattened but the spinous processes are in normal alignment. There is a vertical incisional scar over the mid lumbar back, measuring seven inches in length, through which he states that the disc between the fourth fifth lumbar *Page 77 
vertebrae was removed and the fourth and fifth lumbar vertebrae fused to the sacrum by a clothes pin fusion. He does all back movement in a guarded and limited fashion. He does about forty degrees forward bending and fairly normal backward bending except that motion is reduced in the lower lumbar vertebrae. Right lateral bending is done without complaint but he states that he has pain in lower left back on left lateral bending. The patella reflexes are normally present bilaterially. The left achilles reflex is normally present, but the right is absent. There is a curved linear scar over the left shin measuring 10 inches in length. This represents the donor area from which the graft was removed. Conclusions: It is impossible to predict the degree of his recovery at this time, but I am certain that he is unable to do any laborious work."
Again on Page 6 through Page 8:
"Q. What is the consensus of the medical profession as to the cause of a ruptured intervertebral disc? A. I do not think any one knows the last word about disc injuries, but it is thought that a great many disc injuries come about by repeated straining or repeated trauma by which the disc is gradually extruded and finally ruptures and there are probably some instances in which one injury may be responsible for a ruptured disc but the condition is brought about by the disc being squeezed between the two vertebrae which the disc cushions.
"Q. What is the effect then of the disc being squeezed between the two vertebrae, does that impinge on the nerve? A. The symptom is brought about by the extruded disc making pressure on the nerve.
"Q. Is the purpose of the operation to remove that portion of the extruding disc so as to remove the pressure on the nerve which is being pinched? A. That is right.
"Q. Now, in this particular case, Doctor, Mr. York went to work for the duPont Company in January, 1940, and he worked regularly for that company without any complaints about his back until the fall of 1944, I will say that in the spring of 1944 he said that he was feeling rather badly and complained of lumbago and went to Hot Springs and stayed a few weeks and he testified on that particular occasion he was feeling more or less bad all over, but from January 1940 until September 1944, or a period of nearly four years, he worked for this defendant company performing hard, laborious work, which required bending and lifting and climbing ladders, pulling heavy hoppers, which the testimony shows required full strength of a good, husky fellow, I will ask you if Mr. York had had this condition during that time, that is, the ruptured intervertebral disc, is it your opinion that he could have worked doing that hard work without any pain in his back? A. Not if he had an extrusion of a disc, he could not.
"Q. I would also ask you if, assuming that the history that I have given you is correct, that is, that Mr. York did that type of work requiring extreme physical strain in pulling these hoppers, in removing nuts with a heavy wrench and climbing ladders and other types of work at that plant, if that would be of a sufficient strain to cause his rupture of intervertebral disc? That is, with that type of work could it cause it? A. Yes, I would have to say that it would be, because we have ruptured discs in some people who give no history of any definite accident and in whom it appears to come about just from the ordinary strains of life that any individual undergoes, and therefore I would say that anyone who is doing laborious work would certainly have done something at some time that could do it.
"Q. Doctor, I understood you to say while ago that some of the ruptured discs occurred as a result of a series, or several, strains or traumas while others result from one individual trauma? A. That is the present day belief, although it is a thing that is difficult to prove."
Again on Pages 14 and 15:
"Q. As a matter of fact although people that do not do hard work do have this condition, ruptured disc, as a matter of fact, people that do do hard work and a lot of straining have them more often than people that do not do heavy work? A. Yes, it is more common among people that do hard work. *Page 78 
"Q. I suppose that is the basis on which the medical profession arrived at the decision that these conditions result from a series of strains which you described? A. Yes."
* * * * * *
"Q. You said, however, that this could come about from one isolated condition as well as a series of trauma? A. That is right."
Dr. Dean H. Echols, neuro-surgeon, testified in part as follows:
"A. Mr. York's particular problem was more complicated than the usual one, and I agreed with Dr. Altenberg, the consulting orthopedist, that it would be well to do more than the simple disc operation.
"Consequently, on August 2, 1945, Dr. Altenberg and I operated on Mr. York, each of us doing a different part of the operation.
"I opened the spinal canal at the level of the lowest of the intervertebral discs. This intervertebral disc, which is known as the fifth disc, was found to be perfectly normal, and the nerve at this level was not pinched. The fourth disc was next exposed and found to be the ruptured one. As much of this disc as possible was removed, and the usual silver clips were placed in the interior of the disc, for x-ray reference. The nerve root at the level of this abnormal disc was thoroughly uncovered, to prevent any recurrence of the sciatic pain. Having completed my part of the operation, I dropped out and returned the patient to Dr. Altenberg for the spinal fusion."
Again on Pages 12, 13 and 14:
"Q. Well, now, doctor, without going back to the history as reflected by your records there, if it is shown in this case that Mr. York went into what is known as the T.E.L. department of the duPont Company, that is, the tetraethyl-lead department, in January, 1940, where he served as a manual laborer, performing duties which required him to handle heavy objects, in some instances requiring his whole strength to push and handle those objects, and to climb considerably and to twist and bend and to pick up things, and if it is shown that he continued in that capacity continuously from that date January, 1940, up to April, 1944, when he first began to detect this pain which you mentioned from the history, and if it is shown that sometime during that year 1944, he was required to take off several weeks on account of his back, but was then able to resume his duties and to perform his duties, comparatively free of pain for several months thereafter, up until sometime in January 1945, when on or about January 10, 1945, in pushing an extremely heavy object, he felt a sudden sharp pain in his back, and, following that, was required to remain off duty for some twelve weeks or more, during which he was treated by a traction process and otherwise to relieve the back pain, and if it should be thereafter shown that when he did return to work, he was placed on light duties and continued to suffer some pain and disability in his back, and pain down his leg, which you have described, up to the time that he came to Oschner Clinic, or up until the time he came here for the first examination which was made by your associate, Dr. Kirgis, what bearing does that history have upon the condition that you found at the time of your diagnosis and at the time of your operation? A. Such a history suggests that the heavy labor described might have caused or contributed to the back condition for which we operated.
"Q. Now, is that conclusion emphasized by the fact that the history otherwise shows that from January 1940 down to the time in 1944 when he first detected these initial pains, he was continuously employed doing that hard work, without any pains or disability, and that during that time he was performing no other outside manual work or labor of any kind? A. Yes."
Under cross examination, Dr. Echols testified in part as follows:
"Q. Dr. Echols, what is the cause or the causes of a ruptured disc? A. There is still considerable debate going on among authorities as to why intervertebral discs rupture, but certainly everyone has agreed that the majority of ruptured discs are the result of heavy lifting, particularly in awkward positions. Others are caused by falls, such as in sitting down hard, but there are maybe twenty-five per cent of *Page 79 
ruptured discs which cannot be explained on any basis. Many authorities believe in those mysterious cases that probably the disc ruptured as a result of a series of minor unnoticed accidents, such as trying to lift things that were really too heavy, perhaps several times a week over a period of years, repeated minor lifting injuries.
"Q. Well, is there such a thing as a congenital ruptured disc, or does the profession recognize such a thing? A. There is very little proof that some people are born with discs that are destined to rupture even without lifting injuries, but certainly many people are born with bony defects in the back which predispose to rupture of the adjacent intervertebral disc.
"Q. What in your opinion is the most common cause that your experience has shown you of ruptured discs? A. The most common cause in my experience is lifting heavy objects.
"Q. And does the rupture come on in the lifting of these heavy objects suddenly, or is the onset gradual? A. Both types are seen frequently. Occasionally the trouble all comes on at the time of lifting and straining, and in other cases the trouble seems to develop slowly over a period of a year or even longer, apparently getting worse with each lifting event.
"Q. Do these ruptures come about from a pushing of a truck or go-cart or whatever you might call it, in an industry, on two or four wheels? Would that cause such a strain on the spine as to cause a ruptured disc, in the absence of heavy lifting, say? A. Well, I wouldn't quite see how the simple act of pushing a little truck of some kind could cause a disc to rupture.
"Q. Well, suppose it was a truck that was loaded, say, with pigiron, several hundred pounds, on a truck that rolls freely, and that one man could handle, would that likely cause a ruptured disc? A. well, I can see how such truck, if it came to an obstacle, might require some very hard straining of back muscles to get it over the obstacle or to get it started again.
"Q. Well, that would be in the nature of lifting, would it not? A. No, it might be mere pushing.
"Q. Over a door jamb or something of that kind? A. Yes, sir, over a door jamb, I might see how he would rupture a disc or contribute to an already injured disc."
Plaintiff York had a congenital abnormality of the spine and in such cases Dr. Echols was of the opinion that "it does not require as much trauma" "to bring on a disc injury as in the case of a normal back."
Dr. Alfons R. Altenberg, orthopedic specialist from New Orleans, performed a portion of the operation on plaintiff. He testified that York had a congenital condition of his back but in his opinion he doubted that this abnormality could have been the cause, in itself, of the ruptured disc without the interference of an accident.
He testified, as follows:
"Q. Doctor, in answer to the questions Mr. Porter just asked you, as to whether or not that congenital condition in itself could have brought on the ruptured disc, you said you doubt it? Will you explain that a little more fully? Why do you doubt that? A. I doubt that an individual with such congenital anomaly as I have described would have a ruptured disc without having had either constant minimal trauma or a single large trauma.
"Q. Would your position be * * * A. May I say something else? I think that is largely neuro-surgical.
"Q. Yes, but we got into that by general consent. Is your conviction as to the correctness of that conclusion increased in this case with the history of this case showing that this man was doing hard manual labor from 1940 down until the time that this pain was first observed in May 1944?
"Mr. Porter: That is assuming that he did do hard manual labor.
"Mr. Benton:
"Q. And he moved heavy hoppers in some cases weighing as much as 4,250 pounds, pushing them around on rollers, and during the early years, in doing that kind of work, he did not have that kind of *Page 80 
disability and pains. Considering that, would that increase the correctness of your conviction that you doubt whether or not the congenital condition alone could cause the ruptured disc, or did cause a ruptured disc in this case?
"Mr. Porter: That is assuming the facts that Mr. Benton stated are correct.
"Mr. Benton:
"Q. I put that in the form of a hypothetical question. A. Well, I think — I will put it this way: I think that individuals who are doing heavy work have a greater tendency for rupturing a disc than those who are doing light work."
Again on Page 50:
"Q. And if it shows from that time down to — I think one of your histories shows May and another history shows April 1944, which would be a period of more than three years that he was continuously so employed, doing heavy manual labor, without pain or disability, and if it is also shown that he did develop this pain in April 1944, about which he complained when he talked to you, but that he continued to work, and, following that, I think in November of that same year or sometime during that year, he was required to take off some time on account of his back; and that following 1944, sometime in January 1945, on or about January 10, 1945, while pushing a heavy load of pig iron, he suffered a sudden sharp pain, and thereafter was disabled to do any work and went under treatment which involved traction treatment for a period of twelve weeks, and then was placed on light duty for several months, during which he didn't do any heavy work at all, up to the time of your first examination, what would you say that history suggests to you as to the cause of the condition which you find in his case, both at the time of your original examination and at the time of the operation? A. I believe that if such a history were given, one could conclude or believe that the injury or that the sharp pain either accompanied the rupture or protrusion of a disc or accentuated one pre-existing."
Again on Page 53:
"Q. Now, Doctor, if in this case the history also shows that the early stage of his back complaints were not attended by any pain that radiated down his leg and then later on, following a particular act of straining which the patient himself recalls, thereafter he did begin to notice this radiation of pain, what does that suggest as to the prognosis of development that has taken place when it is subsequently shown that he has a ruptured disc? A. The pain without radiation could be from either the congenital anomaly present or from a ruptured disc which had not yet produced sciatic radiation. The onset of sciatic radiation would lead one to believe that a ruptured disc were present."
Dr. S. R. Rankin's testimony was taken by deposition. Dr. Rankin was employed by the defendant company and during this time became acquainted with the plaintiff, York. This witness identified the hospital records, some of which were under his supervision at the time of his employment by the defendant. He also testified that York never complained to him of an injury to his back sustained while engaged in the scope and course of his employment as an employee of the defendant company, but that he "did recall that Mr. York stopped me in the hall of the plant hospital and stated that he had been to the Oschner Clinic and Mayo Clinic and intimated he had been told his back pain was a result of some injury or accident." His testimony corroborates the testimony of York that he had spoken to Dr. Rankin after his ailment was diagnosed as a ruptured disc and told him he had been informed that his back condition was due to an injury and not a disease. This conversation between the plaintiff and Dr. Rankin took place in August, 1945.
Dr. Rankin was asked, in Cross Interrogatory No. 5, the following question: "If the record in this case shows that Mr. York went to work for the duPont Company in January, 1940 and that he continued to work thereafter regularly for that company without any serious or other complaints about his back until the fall of 1944, or say the spring of 1944, or a period of nearly four years in which he performed laborious work that required bending and lifting and climbing ladders and pulling heavy hoppers, do you believe that during *Page 81 
this period of time he could have had a ruptured intervertebral disc?"
In answer to Cross Interrogatory No. 5, the witness says: "Obviously, yes, as that is always a possibility."
He was further asked, in Cross Interrogatory No. 9, the following question: "As to any complaints made to you by Mr. York about his back, what diagnosis did you make?"
In Answer to Cross Interrogatory No. 9, the witness says: "The possibility of a herniated disc was considered. This opinion was based on the patient's history, his symptoms, and his verbal reports regarding numerous other physicians he had consulted for treatment."
The testimony of Dr. Vernon B. Beam was also taken by depostion interrogatories and cross interrogatories. Dr. Beam testified that he was licensed to practice medicine in Louisiana in 1945; that his license was not renewed due to the fact that he was transferred to East Chicago in June, 1945. During the time spent in Louisiana, he was in the employ of the defendant company; that he did not remember the plaintiff reporting any injury to him during January, 1945, but that it had always been his practice to fully and carefully record any occupational accidents and he was certain if plaintiff had reported such an injury to him it would have been recorded.
Dr. Beam further testified that: "A ruptured intervertebral disc is usually the result of performing heavy lifting or straining, or pulling or pushing heavy objects. It may occur either as the result of one particular incident, or by performing this type of work over a long period of time. However, in a small percentage of cases it may occur with no definite cause, and the exact cause cannot be determined. A malalignment of the lumbar vertebrae is usually a congenital condition, and not the result of an injury."
Dr. Beam was asked the following question, as Cross Interrogatory No. 5; "If the record in this case shows that Mr. York went to work for the du Pont Company in January, 1940 and that he continued to work thereafter regularly for that company without any serious or other complaints about his back until the fall of 1944, or say the spring of 1944, or a period of nearly four years in which he performed laborious work that required bending and lifting and climbing ladders and pulling heavy hoppers, do you believe that during this period of time he could have had a ruptured intervertebral disc."
Answer to Cross Interrogatory No. 5: "It is possible that Mr. York could have sustained a ruptured disc from performing that type of work."
Dr. Beam made no diagnosis of the plaintiff's ailment, nor did he make any x-rays or other examinations of plaintiff's back. He testified that from his personal observation, ruptured discs usually cause severe pain and disability, and that the pain and disability vary considerably from day to day with a ruptured disc, and at times the patient may have no pain or disability.
Physical examination records of York were also offered in evidence which are negative in so far as any back trouble is concerned as of the date of his first employment in 1940.
Plaintiff testified that he received his regular salary during the period he was assigned to light duty. There was in effect a group insurance plan, whereby the defendant and its employees paid the premiums on the accident and health policies with Equitable Life Insurance Company and Metropolitan Life Insurance Company. This insurance was for the benefit of all employees for ailments non-occupational and not acquired on the job. The record shows that York exhausted all of the benefits possible under this non-occupational insurance plan, and in his statement, in order to obtain these payments, he stated that the accident did not happen while he was at work, in other words, that his ailment was non-occupational. Exhibit D. 4 is an application made and signed by the plaintiff, James O. York, addressed to the "Equitable Life Assurance Society" on January 30, 1945, in which the plaintiff stated: "I hereby apply for a (sickness) (accident) benefit as an employee of E. I. duPont Company on account of total disability which is in no way due to or *Page 82 
connected with my employment and which commenced on January 21st, 1945." Dr. Frank Brostrom, on January 30, 1945, signed the "Attending Physician's Statement," as shown on this exhibit. This physician's statement states: "Patient was (injured) (Taken sick) April 1944." Also on the exhibit is the employer's statement which shows the first full calendar day of disability to be January 21, 1945, with the following: "Q. Is there possibility of workmen's compensation liability? A. No."
Defendant has also introduced as Exhibit D-1, "Statement of Claim for Group Hospitalization Benefits." This application was made to the Metropolitan Life Insurance Company by James O. York on October 23, 1945. It shows that the plaintiff answered, "No accident" to the question: "Were you at work when the accident happened?" Upon this claim, York received $108 for hospitilization confinement. On the same day, October 23, 1945, as shown by Exhibit D-2, York applied to Metropolitan Life Insurance Company for weekly payments. Both applications (D-1 and D-2) were approved by the defendant company through its authorized representative.
Also filed in the record by the defendant is Exhibit D-3, which is a letter written by the plaintiff, James O. York, while in the Touro Infirmary, to Miss Ruth Borland, Nurse in the employ of the defendant company, wherein he asked for some insurance papers.
Plaintiff attempts to explain his answers by stating that: "At that time I did not have any money to live on, so that was about the only thing I could do if I was to see other doctors and get any medical attention, was to say that it didn't happen on the company job, in order for me to draw my regular salary." Further, he stated: "In the insurance papers for Equitable Life Insurance Company it states, 'Did this accident happen on the job?' If you put 'Yes' you don't get anything. If you say 'No' you get your regular salary plus $25.00 a week."
Defendant contends that if plaintiff had any accident it occurred while on a party at Magnolia Beach on January 5, 1945. There is a notation in the hospital records made by Dr. Rankin on January 6, 1945 at 10:00 a.m., with regard to plaintiff York which states: "Had acute attack of back pain in getting out of auto at 3:30 — 1-5-45 * * *" While York testified that he had occasion to remember January 5th due to the fact that he attended a birthday party for a relative on that date at Magnolia Beach and implied that he must have imbibed rather freely at the party for he did not remember the time he got home, in fact, he testified he did not remember much about it, and then on January 6th, we find this notation in the hospital record which York evidently told Dr. Rankin. It is not shown whether the "acute attack of back pain" was at 3:30 a.m. on January 5, 1945, or 3:30 p.m. on January 5, 1945. There is nothing positive in the record, in fact, there is no testimony to show York had suffered any kind of an accident at the party, other than loss of memory.
We, therefore, have a case in which the facts show that plaintiff was a healthy man when he was employed by the defendant company in 1940; that he performed all the duties required of him for approximately four years without any difficulty or complaint; that he then began to experience backaches which grew progressively worse from November, 1944, until his operation on October 2, 1945; that he was in no sense of the word a malingerer; he went to see approximately eighteen doctors, took their advice and treatment and still to no avail. He reported to the hospital of the defendant company and was given treatment for his back repeatedly.
Also, we have filed applications for insurance and hospitalization by the plaintiff but which should not estop him from claiming a compensable accident except that they do tend to disprove any single accident as a cause of his condition. Further, the employer approved of these applications and is in the same category as York after August 1945, for it was on that date that York first was given the idea that his trouble was due to an injury and not a disease, and it was also during that time that he reported the diagnosis of Dr. McHugh and the doctors at Oschners Clinic to the defendant company. It is true that *Page 83 
on October 23rd, York definitely knew, as well as his employer, that his trouble was a ruptured disc, however, under the facts in this case we do not believe that this should estop him from claiming and proving a compensable injury under our laws.
It is apparent from the testimony in this case that the plaintiff York had no idea as to what was really wrong with his back until after Dr. McHugh examined him in August, 1945, and diagnosed his trouble as a ruptured disc, which diagnosis was verified in the latter part of August or first of September by Dr. Echols of the Ochsner Clinic. It is, therefore, reasonable that plaintiff did not connect his injury with an accident at the plant. The record shows that he reported all that he knew by going to the hospital repeatedly, and, the company doctors should have been placed on their guard or at least should thoroughly have examined the plaintiff. It is established, however, that as soon as his trouble was diagnosed as a ruptured disc that he did report to Robert R. Palmer, Safety Engineer of the defendant company, and to Dr. Rankin, and told them that his trouble was due to an injury and not a disease. After a consultation, the representatives of the defendant company declined to consider the injury as a compensable one under the Compensation Laws. It was not until October 2, 1945, the date on which the operation was performed that the plaintiff could positively know that his trouble was due to a ruptured intervertebral disc caused by an injury or a succession of slight injuries and, therefore, possibly compensable in accordance with our compensation laws.
We also have definitely established by the medical testimony that one performing labor such as the plaintiff performed for the defendant, and one having a congenital abnormality such as plaintiff had is more susceptible to trauma and, as a result, a ruptured disc than one whose labors are light or one who performs no manual labor at all. The doctors were all in accord that a ruptured disc could be caused by the ordinary performance of such duties as York was required to do on various jobs he held while employed by the defendant, that is, that a ruptured disc could come about by repeated minor or small strains or trauma over a length of time. Clearly, as York failed to establish a single strain or accident as alleged on or about January 10, 1945, his case must then of necessity rest upon proof of repeated minor injuries or repeated trauma as a cause for the ruptured disc, which we believe he has proven. The testimony convinces us that he suffered a ruptured disc while at work for defendant.
In the case of Hill v. J. B. Beaird Corporation, La. App.,19 So.2d 295 and 296, the Court said:
"It is conclusively established that plaintiff was suffering at the time of trial from an enlarged ring on the left side, sometimes referred to as a potential hernia, and an incomplete inguinal hernia on the right side. The defense is that plaintiff sustained no accident while in the employ of the defendant within the meaning of the Compensation Act, and that he must have been affected with the hernia prior to his employment by defendant.
"It is well established by our jurisprudence that the protection accorded by the Compensation Act of our State, Act No. 20 of 1914, as amended, against injury by accident comprehends and includes the giving way of affected parts of the body while at work, even though the disability was not the immediate result of an unusual strain or physical effort. This rule is fully discussed in a case which was before this Court on three distinct occasions, and in which each of the three members of this Court wrote an opinion. We refer to Biggs v. Libby-Owens-Ford Glass Co., La. App., 170 So. 273; Id., La. App., 173 So. 898; and Id., La. App., 178 So. 639.
"It is well established that the plaintiff in a compensation case must prove his claim, and we thoroughly agree with the cases cited by diligent counsel for defendant to the effect that speculation and probabilities are not sufficient to justfy a decree in favor of a plaintiff in the absence of his establishment of his claim with reasonable certainty.
* * * * * * *Page 84 
"After carefully weighing all the facts in this case, we are satisfied that plaintiff was not suffering from hernia at the time he entered defendant's employ, and that he sustained the hernia in the course of his employment by defendant. To refuse recovery in this case would necessitate a finding that plaintiff suffered from hernia prior to his employment by defendant, which finding would be at variance with the facts."
Also in the case of Biggs v. Libbey-Owens-Ford Glass Company, La. App., 170 So. 273, 275, the Court said: "The inescapable fact is that plaintiff, on November 5th, had hernia so far developed that it would unquestionably prevent him from performing the work he was performing on November 2d. All the doctors agree in this conclusion. Therefore it follows that this hernia, or rupture superinducing same, came into existence at the time plaintiff says it did or between that time and November 5th, when he was last examined by defendant's doctor. The record is barren of any direct testimony tending to prove that it occurred during the latter period, and we feel certain that it did not then happen. Therefore does not plaintiff's contention as to the time it occurred stand materially unaffected by the inconclusive circumstantial evidence offered against it? We think it does. He was pronounced physically sound by the glass company's physician on September 3d. He worked continuously for the company until November 2d and quit work under the circumstances hereinbefore related. He was found afflicted with the hernia on November 5th. The difference in his condition certainly arose while he was performing the services of his employment. Plaintiff's right to recover is secured to him, even though his disability was not immediately caused by an unusual strain or physical effort, or some awkward movement of his body. It is sufficient for recovery that the affected parts of his body gave way while at work for defendant."
We are of the opinion that the testimony proves that York's condition was due to repeated trauma caused by the manual labor which he performed while in the employ of the defendant; that he suffered this ruptured disc while in the course and scope of his employment. At the date of the trial, the testimony convinces us that he was permanently and totally disabled but that he might in the future, if his operation was a success, be able to return to work.
Plaintiff was to furnish statement of medical expenses, however, he failed to do this. There is in the record the testimony of Dr. Kern that his bill was $32 of which $25 remains unpaid. There is also in the record a bill from Dr. Dean Echols and Dr. Alfons Altenberg for $50 each for expert testimony given in this case. Plaintiff is entitled to judgment in these amounts.
According to the testimony, plaintiff was placed on restricted duty April 26, 1945, and was unable to perform his regular duties from that time until his employment ceased, and is, therefore, entitled to compensation from April 26, 1945 for a period not to exceed four hundred weeks. Defendants are to be given credit for weekly compensation paid from April 26, 1945 to September 14, 1945, or twenty weeks.
For the reasons above given, it is therefore ordered that the judgment of the District Court be reversed and that there be judgment in favor of the plaintiff, James Oliver York, and against the defendant, E. I. duPont de Nemours and Company, awarding plaintiff compensation beginning April 26, 1945, at the rate of $20 per week, payable weekly, not to exceed four hundred weeks, less a credit of twenty weeks previously paid, with legal interest on each of said unpaid installments from their respective maturity dates until paid.
It is further ordered that plaintiff be awarded judgment against defendant in the full sum of $32 as medical expenses.
It is further ordered that the fee for expert testimony of Dr. Echols and Dr. Altenberg be fixed at $50 each and same be taxed as costs, and it is ordered that defendant pay all costs. *Page 336